## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**D'ERICA and ROGER BLACKMON,**
**as GUARDIANS AND NEXT FRIENDS OF**
**E.B., A MINOR**                                                        **PLAINTIFFS**

**v.**                                    Case No. 2:25cv154-JM

**MCGEHEE SCHOOL DISTRICT,**                                            **DEFENDANTS**
**LINDA TULLOS, in both her official and individual**
**capacities, JUSTIN HOLT, in both his official and**
**individual capacities, MARCUS HADDOCK, in both his**
**official and individual capacities, PAUL PROSSER, in both**
**his official and individual capacities, CHRIS HAWKINS, in both his**
**official and individual capacities, TYLER PERRY, in both**
**his official and individual capacities; JEFF OWYOUNG, in**
**both his official and individual capacities; JUDY LATTIMORE,**
**in both her official and individual capacities; CLARKE PUGH, in**
**both his official and individual capacities; TOBY YOUNG, in both**
**his official and individual capacities**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 08 2025

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

## COMPLAINT

Come now the plaintiffs, by and through undersigned counsel, and for their Complaint state:

### PARTIES, JURISDICTION, AND VENUE

1.      E.B. is a minor child who was enrolled in the McGehee School District during the 2023-2024 school year.

2.      D'Erica and Roger Blackmon are E.B.'s parents.

3.      D'Erica Blackmon, Roger Blackmon, and E.B. are residents of McGehee, Arkansas, and citizens of the State of Arkansas.

4.      McGehee School District (MSD) is a school district and body corporate based in and providing services in the municipality of McGehee, Arkansas.

1

**This case assigned to District Judge** _Moody_
**and to Magistrate Judge** _Erwin_

5.    Linda Tullos is a citizen of the State of Arkansas who, at all times relevant to this complaint, was Superintendent of the McGehee School District.

6.    Justin Holt is a citizen of the State of Arkansas who, at all times relevant to this complaint, was Assistant Superintendent of the McGehee School District.

7.    Paul Prosser is a citizen of the State of Arkansas who, at all times relevant to this complaint, was Principal of McGehee High School.

8.    Carl Haddock is a citizen of the State of Arkansas who, at all times relevant to this complaint, was Dean of Students and Athletic Director for McGehee High School.

9.    Chris Hawkins is a citizen of the State of Arkansas who, at all times relevant to this complaint, was a certified law enforcement officer employed by the McGehee Police Department and School Resource Officer for McGehee High School.

10.    Tyler Perry is a citizen of the State of Arkansas who, at all times relevant to this complaint, was a certified law enforcement officer employed by the McGehee Police Department.

11.    Defendants Tullos, Holt, Prosser, Haddock, Hawkins, and Perry are being sued in their official and individual capacities.

12.    Defendants Jeff Owyoung, Judy Lattimore, Clarke Pugh, and Toby Young were members of the McGehee School Board during the 2024-2025 school year, and voted to expel E.B. from MSD on March 18, 2025.

13.    Defendants Owyoung, Lattimore, Pugh, and Young are being sued in their official and individual capacities.

14.    McGehee School District is based in McGehee, Arkansas, and the other defendants are all believed to reside in or around McGehee, Arkansas, and therefore within the territorial jurisdiction of this Court.

15.    The controversy arose in whole or in substantial part in or around McGehee, Arkansas, and therefore within the territorial jurisdiction of this Court.

16.    Jurisdiction is proper in this Court, as this suit claims violations of federal constitutional and statutory rights.

17.    The Court possesses supplemental jurisdiction over any claims not encompassed by Federal Question jurisdiction.

18.    Venue is proper in this Court.

<u>LEGAL & REGULATORY BACKGROUND</u>

19.    Section 504 and Title II of the ADA prohibit public entities, including public schools, from discriminating against students on the basis of their disabilities. 29 U.S.C. § 794; 42 U.S.C. § 12132 et seq. They require public schools to modify their policies, practices, and procedures as needed to avoid discrimination, and to provide students with disabilities equal educational opportunities. *Id.*

20.    Section 504 also requires covered entities to provide children with disabilities a Free Appropriate Public Education. FAPE under Section 504 requires special education and related services designed to meet the needs of children with disabilities as adequately as the needs of children who do not have disabilities. See 34 C.F.R. § 104.33(a), (b)(1).

21.    Title II of the ADA prohibits discrimination on the basis of disability by state and local government agencies, including public school districts. 42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130.

22.    Under Title II of the ADA, public schools must provide students with disabilities with opportunities to participate in school services, programs, and activities that are equal to those provided to students without disabilities. 28 C.F.R. § 35.130(b)(1)(ii), (iii).

23.    Both the ADA and Section 504 prohibit states and local governments, including public school districts, from discriminating when providing educational services, programs, and activities to children with disabilities. See 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1).

24.    Further, public schools may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities. See 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4).

25.    Both Section 504 and Title II of the ADA require public school districts to provide aids, benefits, and services to students with disabilities in the most integrated setting appropriate to the student's needs, which is defined as a setting that enables individuals with disabilities to interact with persons without disabilities to the fullest extent possible. 34 C.F.R. § 104.4(b)(2); 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35, App. A, p. 450.

26.    Students who possess a disability that interferes with their ability to learn in a general education classroom are entitled to a 504 Plan.

27.    A 504 Plan is a blueprint for how the child will access learning at school.

28.    A public school is required to "conduct an evaluation...of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a).

29.    The school's evaluation procedures must ensure that "tests and other evaluation materials have been validated for the specific purpose for which they are used and are administered by trained personnel in conformance with the instructions provided by their producer," that "[t]ests and other evaluation materials include those tailored to assess specific areas of educational need

4

and not merely those which are designed to provide a single general intelligence quotient," and that tests accurately reflect a particular student's ability. *Id.*(b).

30.    In evaluating data and making a placement decision, a school must:

> (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered, (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the placement decision is made in conformity with § 104.34.

*Id.*(c).

31.    This requirement applies to situations in which serious discipline—as relevant here expulsion—is being considered.

32.    A student being questioned with respect to suspected involvement in a crime is entitled to a *Miranda* warning and to have the opportunity to have their parents present. *See* Ark. Code Ann. § 9-27-317.

<em>Discipline & Expulsion Procedures</em>

33.    Ark. Code Ann. § 6-18-502 sets forth requirements for school discipline policies.

34.    The possession of a firearm is the only disciplinary violation for which expulsion is required.

35.    Section 502(c)(3) provides that such policies must "[e]stablish procedures for notice to students and parents of charges, hearings, and other due process proceedings to be applicable in the enforcement and administration of such policies by the school administrator and by the school district board of directors."

36. Section 502(c)(4) requires that disciplinary policies "[i]nclude prevention, intervention, and conflict resolution provisions."

37. MSD has promulgated policies and procedures that govern the District and the schools therein.

38. Paragraph 11 of MHS's School Discipline Procedures, entitled "Beer, alcoholic beverages or drugs.", provides:

> A student shall not possess, sell, attempt to sell, attempt to buy, use, transmit or be under the influence of alcohol or intoxicants of any kind. A faculty member observing a student displaying unusual behavior and possibly under the influence of drugs or alcohol shall take the student to the principal's office. After observing and talking with the student, if the principal of his/her designee suspects drug abuse, the parent/guardian shall be notified. If the school is unable to reach the parent/guardian and the situation warrants, law enforcement or medical authorities will be notified.
>
> The principal or his/her designee shall call law enforcement officials if suspected illegal drugs are confiscated. The suspected illegal drugs shall be handed to the law officer personally by the principal or his/her designee for appropriate action. The parent/guardian shall be contacted and notified of the situation concerning his/her child and given an opportunity to appear with the student before school officials.

39. Paragraph 12, entitled "Possession/Use of tobacco products and/or Tobacco substitute products.", provides: "Possession of tobacco products or tobacco substitute products (examples: e-cigarettes, vapor cigarettes, etc.) by students while on campus will be prohibited. This includes smoking, dipping, or chewing. This policy also includes all paraphernalia of said products."

40. The provision regarding potential consequences for violations of these two paragraphs set forth a minimum two-day suspension and 4 hours of community service, a maximum of ten days' suspension with a possibility of expulsion, and the directive, in bolded terms, that "**Use/possession of drugs/controlled substances will result in the maximum.**"

6

41.    Ark. Code Ann. § 6-13-619 governs school board meetings.

42.    Under the Arkansas Freedom of Information Act:

> Except as otherwise specifically provided by law, all meetings, formal or informal, special or regular, of the governing bodies of all municipalities, counties, townships, and school districts and all boards, bureaus, commissions, or organizations of the State of Arkansas, except grand juries, supported wholly or in part by public funds or expending public funds, shall be public meetings.

Ark. Code Ann. § 25-19-106(a).

43.    Under Ark. Code Ann. § 6-18-507(d)(1), "A superintendent may recommend the expulsion of a student for more than ten (10) days for violation of the school district's written discipline policies, subject to appeal to the board of directors and to requirements of the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 et seq."

44.    Ark. Code Ann. § 6-18-507(d) further provides:

> (2)(A) After hearing all testimony and debate on a suspension, expulsion, or appeal, the board of directors may consider its decision in executive session without the presence of anyone other than the board members.
>
> (B) At the conclusion of an executive session, the board of directors shall reconvene in public session to vote on the suspension, expulsion, or appeal.
>
> (3) A school district board of directors meeting entertaining an appeal shall be conducted in executive session if requested by the parent or guardian of the student provided that after hearing all testimony and debate, the board of directors shall conclude the executive session and reconvene in public session to vote on such appeal.

45.    A student facing expulsion is entitled to notice of the meeting at which her fate will be decided, the reasons expulsion is being considered, and an opportunity to be heard on the issue of expulsion.

46.    This requirement is imposed by the Due Process Clause of the United States Constitution.

7

47.    This right to Due Process is also set forth by the Arkansas Constitution.

48.    The section of MSD's School Discipline Procedures governing "Expulsion" requires at least three calendar days' written notice of the hearing at which the student's status will be decided and the reasons for the recommendation, and allows the minimum or maximum timeline to be waived by agreement of the district and student:

> The Superintendent shall give notice to the parent or guardian (mailed to the address reflected on the school district records) that he/she has recommended to the Board of Education a student be expelled, and the notice shall contain a statement of reasons for this recommendation. The notice shall reflect the date, hour, and place where the Board of Education will consider and dispose of the recommendation, and such hearing shall be conducted not earlier than three (3) calendar days nor more than seven (7) calendar days following the date of the notice, except that representative of the Board and student may agree in writing to a date not conforming to this limitation.
>
> The President of the Board, or in his/her absence another member selected by the Board, shall preside at the hearing which will be a public hearing. (Act 441 of 1979 amends the Freedom of Information Act to allow school boards to consider pupil suspension matters in executive session if such is requested by the parent or guardian of the student.)

McGehee High School Handbook at 25.

49.    Moreover, it sets forth a procedure by which the superintendent may present evidence and the student may respond to the charges and evidence, and at least some limited potential opportunity for cross-examination.

## FACTUAL BACKGROUND

50.    During the 2024-25 academic year, E.B. was a student at MHS.

51.    She has diagnoses for ADHD, anxiety, and language disorder, which all relevant decisionmakers in the district are aware of.

52.    A 504 Plan has been implemented to manage her disabilities.

53. Among her extracurricular activities was the dance team.

54. On March 4, 2025, E.B. was at practice with two other girls in the MHS gymnasium.

55. While the team members were engaged in physical activity, an object slid across the floor, whereupon all three girls went to grab it.

56. Though it did not come from her purse, E.B. picked it up.

57. The other girls moved in close to her.

58. Deciding that the girls were acting suspiciously, dance team coach Kayla Bryant asked for whatever they were hiding.

59. E.B. handed Bryant the object.

60. It was a vape.

61. Upon being questioned, the girls told Bryant that the vape belonged to someone else.

62. Bryant took the vape home with her.

63. Bryant told E.B.'s parents what had occurred and told them she would allow them to address the matter with her without official action being taken by the school/district.

64. Following these assurances, E.B. texted Bryant about the incident

65. The next morning, Bryant texted Ms. Blackmon and told her that Marcus Haddock had found out about the vape and had ordered her to turn it in.

66. Bryant followed up within the hour to inform Ms. Blackmon that Dean Haddock believed the vape to be a controlled substance and was going to conduct questioning of the girls with law enforcement.

67. Mr. Blackmon arrived at the school as E.B. was being questioned by MPD Officer Chris Hawkins, Dean Haddock, and Principal Prosser.

68.    Upon attempting to enter, Mr. Blackmon was physically, forcibly restrained from doing so by Haddock, with the backing of Hawkins.

69.    Mr. Blackmon subsequently made another attempt to enter, and successfully did so this time.

70.    There, he saw his daughter E.B. in tears.

71.    Mr. Blackmon asked why he had not been told of the questioning or allowed in.

72.    Haddock stated that the district had no obligation to allow him to be present for questioning.

73.    Haddock told Mr. Blackmon that E.B. had made a full confession and would be suspended for two days for possession of a vape.

74.    He also stated that the vape would be sent to a lab for scientific testing.

75.    Ms. Blackmon, a former teacher, spoke with Assistant Superintendent Justin Holt to inform him of her concerns following a lack of compliance with her child's rights, and proper procedures.

76.    Holt demonstrated a lack of any concern for such issues.

77.    He told Ms. Blackmon that an expulsion would be no big deal for E.B.

78.    At about 11:30 A.M., Defendant Prosser called Ms. Blackmon and informed her, with detectable relish in his voice, that Officer Tyler Perry of the McGehee Drug Task Force had come to the school, "smelled the vape", and confirmed that it was marijuana.

79.    Prosser stated that the vape would no longer be sent in for scientific testing.

80.    Defendants Haddock and Hawkins referred the matter to the local prosecuting authority for charges to be filed.

81.    On March 10, 2025, E.B.'s parents, Alderman Leroy Hood, Principal Prosser, Dean Haddock, Officer Hawkins, and Coach Bryant met about the matter.

82.    Haddock, who is in charge of discipline for the school, stated he had intentionally not notified E.B.'s parents before interrogating her and identified this as the school's "standard practice."

83.    Ms. Blackmon responded by reading Paragraph 11 of MHS's School Discipline Procedures.

84.    As set forth above, it requires the school to attempt to contact parents and allow them to participate in a meeting with school officials if there is a suspicion that the student has possessed a controlled substance.

85.    Haddock seemed unfamiliar with its provisions and did not appear to agree that it had any relevance to E.B.'s situation.

86.    Coach Bryant made clear that she did not see where the vape came from.

87.    Alderman Hood raised the concern that expulsion on such questionable facts would be unfair.

88.    Nonetheless, the Blackmons left the meeting with the impression that the district had given the issues raised therein no consideration.

89.    Subsequently, Ms. Blackmon spoke with Superintendent Tullos and Coach Bryant.

90.    Tullos acknowledged that the district was guilty of procedural failings, but stated that she still expected to recommend expulsion.

91.    On March 14, a meeting was held to determine whether there was any connection between E.B.'s diagnoses and the infraction for which the district was considering discipline.

92.    The meeting was insufficiently composed of people familiar with her.

93.    Two of the six district representatives work at the elementary school, while E.B. is a high school student.

11

94.     Another participant admitted to knowing little about E.B.

95.     The only information discussed at the meeting was documentation from a 2021 evaluation for services and the dissemination of the definition of ADHD under the DSM-5.

96.     Indeed, Prosser had, despite multiple requests to do so, not disseminated E.B.'s 504 Plan for that school year to her teachers.

97.     Later that day, at approximately 4:03 P.M., Tullos informed Ms. Blackmon by telephone that she would indeed be recommending expulsion and that she would present her recommendation at a meeting to be held on Tuesday, March 18, at 9 A.M.

98.     Ms. Blackmon immediately objected.

99.     The difficulties of the disciplinary situation had seriously negatively impacted E.B.'s mental health.

100.    As such, the preceding Tuesday, March 11, her parents had scheduled an appointment with a psychiatrist for that Tuesday at 8:30 A.M. in Monticello.

101.    Before this exchange, no one from the district had informed the Blackmons that they needed to keep that Tuesday (or, for that matter, any particularly day or other span of time) open.

102.    Given that they were informed of a Tuesday morning meeting by phone at the end of the day on Friday, E.B. and her family were given essentially one business day's notice for a hearing to determine E.B.'s academic and disciplinary future.

103.    Despite being aware and advised by Ms. Blackmon that her daughter's struggles necessitated the appointment and, as a school administrator, likely being quite aware of the fact that finding an opening for a mental health appointment can be difficult in this part of the state, Tullos refused to move the meeting even, as Ms. Blackmon requested, by a matter of hours, to the afternoon.

104.    Ms. Blackmon even stated that, to the extent that concerns about complying with required timelines for disposition were at issue, they would waive them for the day or two necessary to allow them to attend without jeopardizing E.B.'s mental health and be adequately prepared to defend her.

105.    Tullos refused to consider any sort of change in the meeting time.

106.    Counsel retained by the family to address the juvenile case also reached out to request a change in the setting so that *he* would have the opportunity to attend the hearing.

107.    Tullos, again, refused to make any sort of accommodation to th e schedule of E.B. or a representative.

108.    The meeting occurred on March 18, 2025.[1]

109.    Four of the seven members of the school board were present.

110.    School Board President Jeff Owyoung called the meeting to order.

111.    The other members present were Judy Lattimore, Clarke Pugh, and Toby Young.

112.    The meeting lasted approximately 1 ½ minutes from start to finish.

113.    After calling the meeting to order and learning that neither the Blackmons nor any representative was there, Owyoung stated, in a way that gave the impression that he believed it imprudent and perhaps even a bit nonsensical to hold a hearing under those circumstances, that "I don't think there will be an expulsion hearing at this time."

114.    He then entertained a ***motion to adjourn***, which carried by a vote of 4-0.

115.    The video of the meeting ends at this point.

116.    Per the minutes of the meeting, the board "reconvened" at 9:05 A.M.

---

[1] The published minutes of that meeting are attached hereto as Exhibit 1. Copies of two videos that comprise the meeting and some apparent attempted continuation of the meeting were provided by the district, and if requested by the Court, will be provided in an appropriate manner.

117.    A second video from that same day begins with Owyoung stating, "All right, we'll reconvene back out of—uh, back into the special meeting. At this time I'll ask the superintendent or assistant superintendent to state the recommendation."

118.    Assistant Superintendent Holt then recommended to the board that E.B. be expelled.

119.    A motion to accept that recommendation carried by a vote of 4-0.

120.    E.B. was expelled from MSD.

121.    She was removed from the MHS setting.

122.    She was rendered ineligible to participate in afterschool activities like the dance team.

123.    Even though she is able to re-enroll for the 2025-26 school year, she is still restricted from afterschool activities.

124.    In April, 2-3 weeks after the hearing, Ms. Blackmon learned that the vape was actually of a product line that did not contain sufficient THC to meet the legal standard required to qualify as marijuana.

125.    I.e., she determined that the vape did not contain, and was not *capable of containing*, a controlled substance.

126.    She obtained a lab report of the product and, in a meeting on April 8, tried to provide a copy to Holt with the hope that the district would reconsider its hasty, unsupported decision.

127.    Holt declined to actually review or accept the report.

128.    However, he promised to expedite a review of the matter.

129.    A few hours later, he informed Ms. Blackmon that he had gone online and determined that the vape that led to E.B.'s expulsion was different than the vape found online not to have .3%+ THC.

130.    Moreover, he stated that if it had *any* THC in it, it qualified as a controlled substance.

14

131. Mrs. Blackmon emailed Prosser, Haddock, Tullos, Holt, and Krista Fortenberry, the special needs coordinator for the district.

132. Her email provided them with the lab results for the type of vape in question that showed that the vape contained no illegal substances.

133. She informed them that the information could be verified through the manufacturer's website.

134. She also expressed to them her strong belief that scientific testing would be necessary to adjudicate her daughter delinquent.

135. She also reminded Mr. Holt that he stated he would expedite the process of finding the original vape.

136. Further, she noted that despite not actually having the vape in his possession, Holt had a video that showed the item.

137. This video made clear that the vape is a disposable type for which it is impossible to switch out a cartridge.

138. On April 11, 2025, Officer Perry acknowledged that smelling a vape was not the appropriate way to identify whether it contained a controlled substance and stated that he would seek to have the case against E.B. dismissed when he next went to court on April 16.

139. Perry did not show up to court that day.

140. However, the case was continued until April 25, then dismissed upon motion of the prosecutor due to lack of evidence.

141. Thereafter, Ms. Blackmon informed Defendant Tullos of the dismissal and again requested that the district reconsider.

142. Tullos stated that the matter remained closed.

143. Though allowed a brief slot to speak at a May board meeting, the Blackmons were not meaningfully allowed to discuss the mistreatment of their daughter and wrongfulness of her expulsion.

144. On information and belief, E.B. was the only student determined to be in possession of a vape that did not contain a controlled substance who was expelled during the 2023-24 and 2024-25 school years.

145. On information and belief, all other students found with a vape that did not contain a controlled substance were male.

146. On information and belief, all students expelled from MHS during the 2023-24 and 2024-25 school years receive some manner of disability accommodation.

147. On information and belief, no other student has been expelled for possessing a tobacco-only vape.

## CAUSES OF ACTION

### COUNT I: Violation of Due Process

**(Against MSD, Tullos, Holt, Haddock, Prosser, Owyoung, Lattimore, Pugh, and Young)**

148. Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

149. E.B.'s rights to Due Process, as guaranteed by the United States Constitution, Arkansas Constitution, 42 U.S.C. § 1983, the Arkansas Civil Rights Act, and other statutory and other authority, have been violated.

150. Such violations include, but are not limited to:

  a. Pursuit of official discipline after agent of school told family that none would be pursued;

  b. Failure to adhere to promise not to use statements against E.B. after providing such assurance.

16

c. Interrogation of student without parents present;

d. Intentional exclusion of parents from interrogation;

e. Initiation and continuation of expulsion proceedings without proof that purported contraband was controlled substance;

f. Rushing through expulsion process without sufficient investigation or opportunity for E.B. to mount an appropriate response;

g. Insufficient notice of the expulsion hearing;

h. Unjustified refusal to reschedule expulsion hearing;

i. Unjustified decision to hold purported meeting after deciding not to do so;

j. "Reconvening", which in truth, is the holding of a new meeting without notice;

k. The expulsion being the result of a recommendation of the Assistant Superintendent, in contravention of Arkansas law;

l. Refusing to reconsider in the face of evidence demonstrating that the basis of the expulsion was unsupported;

m. Other harms as supported by the record.

### COUNT II: Violation of the Arkansas Freedom of Information Act (FOIA)
### (Against MSD)

151. Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

152. The McGehee School Board members present for the March 18, 2025, met in an unauthorized meeting and/or executive session after the ending of the called meeting and before they "reconvened."

153. Moreover, the evidence and arguments in favor of suspension were not discussed publicly and on the record as required by FOIA.

### COUNT III: Sex Discrimination

17

**(Against MSD, Tullos, Holt, Prosser, Owyoung, Lattimore, Pugh, Young)**

154.    Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

155.    E.B.'s rights to equal treatment with male students, as established by the United States Constitution, Arkansas Constitution, 42 U.S.C. § 1983, the Arkansas Civil Rights Act, Title IX, and other statutory and other authority, have been violated.

## COUNT IV: Disability Discrimination

**(Against MSD)**

156.    Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

157.    E.B.'s rights to equal treatment with non-disabled students, as established by the Americans with Disabilities Act, Rehabilitation Act, Arkansas Civil Rights Act, and IDEA, have been violated.

## COUNT V: Malicious Prosecution

**(Against MSD, Hawkins, Perry, and Haddock)**

158.    Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

159.    The specified defendants initiated juvenile criminal proceedings against E.B. without probable cause and maliciously

160.    The matter was terminated in her favor.

161.    E.B. suffered damages as a result of these misdeeds.

## COUNT VI: Abuse of Process

**(Against MSD, Hawkins, Perry, and Haddock)**

18

162.    Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

163.    Even if the prosecution was set in motion in proper form, it was perverted to accomplish an ulterior purpose for which it was not designed.

164.    The specified defendants committed willful acts perpetrated in the use of process which are not proper in the regular conduct of the proceeding.

**Count VII: Conspiracy in Violation of 42 U.S.C. §§ 1983 & 1985**

**(Against MSD, Tullos, Holt, Haddock, Prosser, Hawkins, and Perry)**

165.    Plaintiffs incorporate, as if fully set forth herein, all factual averments made in the above paragraphs.

166.    The said acts by all defendants, constituted conspiracy to violate E.B.'s constitutional rights. The defendants combined and acted in concert, and entered into an agreement to injure the plaintiffs by unlawful means.

167.    A plan was put in place to pursue expulsion against E.B. despite the lack of a justification for same, the defendants shared the objective to engage in these unlawful acts, and overt acts were committed in furtherance thereof.

<u>PRAYER FOR RELIEF</u>
<u>AND CONCLUSION</u>

168.    E.B. has been deprived of her constitutional rights, the education, environment, and ancillary aspects of her education to which she was entitled.

169.    She suffered a great deal of unwarranted emotional pain and distress, humiliation, uncertainty about her future, isolation from her peers and regular learning environment, and other harms related to the defendants' wrongful actions.

19

170.    The plaintiffs are entitled to damages greater than the minimum required for federal diversity jurisdiction.

171.    Moreover, E.B. is entitled to the full rescission of her expulsion, including all collateral consequences thereof.

172.    Due to the defendants' intentional, reckless, and wanton conduct, she should also be awarded punitive damages.

173.    Additionally, he should be granted attorneys fees and costs and expenses of litigation.

174.    The plaintiffs reserve the right to plead further.

175.    Plaintiffs demand a trial by jury.

WHEREFORE, the plaintiffs prays that the defendants be found liable, for the relief requested, as set forth above, and all other relief to which they are entitled.

Respectfully submitted,

Geoffrey D. Kearney
Ark. Bar No. 2012304

The Law Office of Geoffrey D. Kearney, PLLC
P.O. Box 8276
Pine Bluff, AR 71611
P: 870-376-3068
E: GDK@gdkpllc.com

Attorney for Plaintiff